**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | |
|---|---|
| GREATAMERICA LEASING CORPORATION, | |
| Plaintiff, | No. 10-CV-13-LRR |
| vs. | **ORDER** |
| DAVIS-LYNCH, INC., | |
| Defendant. | |

_____

*TABLE OF CONTENTS*

I.      *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.     *PROCEDURAL HISTORY* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

III.    *SUBJECT MATTER JURISDICTION* . . . . . . . . . . . . . . . . . . . . . . . . . **2**

IV.     *SUMMARY JUDGMENT STANDARD* . . . . . . . . . . . . . . . . . . . . . . . . **3**

V.      *RELEVANT FACTUAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . **3**

      A.     *Players* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
      B.     *Agreements and Assignments* . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
      C.     *Defendant's Alleged Default* . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

VI.     *ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

      A.     *Hell or High Water Clauses* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
            1.     *Acceptance* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
            2.     *Holder in due course* . . . . . . . . . . . . . . . . . . . . . . **10**
            3.     *Defenses* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**
      B.     *Waiver of Defense Clauses* . . . . . . . . . . . . . . . . . . . . . . . . . . **16**
      C.     *Holder in Due Course* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**
      D.     *Damages* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

VII.    *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

# I. INTRODUCTION

The matter before the court is Plaintiff GreatAmerica Leasing Corporation's Motion for Summary Judgment ("Motion") (docket no. 24).

# II. PROCEDURAL HISTORY

On November 26, 2009, Plaintiff filed a Petition at Law ("Complaint") (docket no. 3) in the Iowa District Court for Linn County, case no. 066574, against Defendant Davis-Lynch, Inc. In the Complaint, Plaintiff alleges that Defendant entered into two agreements with Seamless Solutions ("Seamless") and that Seamless assigned both agreements to Plaintiff. Plaintiff claims that: (1) Defendant breached both of the agreements by failing to make the required payments, and (2) because Defendant has enjoyed the possession of equipment that Plaintiff financed, Defendant will be unjustly enriched unless it is ordered to pay Plaintiff the rental value of the equipment.

On January 29, 2010, Defendant removed the action to this court on the basis of diversity jurisdiction. On February 9, 2010, Defendant filed an Answer (docket no. 9). On October 4, 2010, Plaintiff filed the Motion. On October 28, 2010, Defendant filed a Resistance (docket no. 28). On November 8, 2010, Plaintiff filed a Reply (docket no. 34).

# III. SUBJECT MATTER JURISDICTION

The court has subject matter jurisdiction over this case because complete diversity exists among the parties and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332 ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000 . . . and is between citizens of different States").

## IV. SUMMARY JUDGMENT STANDARD[1]

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "[T]o establish the existence of a genuine issue of material fact, 'a [non-moving party] may not merely point to unsupported self-serving allegations.'" *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008) (quoting *Bass v. SBC Commc'ns, Inc.*, 418 F.3d 870, 872 (8th Cir. 2005)). Rather, the nonmoving party "'must substantiate [its] allegations with sufficient probative evidence that would permit a finding in [its] favor.'" *Anda*, 517 F.3d at 531 (quoting *Bass*, 418 F.3d at 873). The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Found. of Am., Inc.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

## V. RELEVANT FACTUAL BACKGROUND

Viewing the facts in the light most favorable to Defendant and affording it all reasonable inferences, the facts are as follows:

### A. Players

Plaintiff is a an Iowa corporation with its principal place of business in Cedar Rapids, Iowa. Plaintiff provides financing to equipment vendor customers. Defendant is

---

[1] An amended version of Federal Rule of Civil Procedure 56 became effective on December 1, 2010, while the Motion was pending. However, "[t]he standard for granting summary judgment remains unchanged." Fed. R. Civ. P. 56 advisory committee's note.

a Texas corporation with its principal place of business in Pearland, Texas. Seamless, a non-party in this action, is an office equipment supplier.

### B. *Agreements and Assignments*

In January 2004, Plaintiff and Seamless entered into a "Private Label Vendor Agreement." Defendant's Appendix ("Def. App'x") (docket no. 28-3) at 1-3. In February 2005, Plaintiff and Seamless entered into a second "Private Label Vendor Agreement."[2] *Id.* at 4-6. Under the terms of the Private Label Vendor Agreements, Plaintiff could provide financing to Seamless's customers at Seamless's request, and Seamless consented "to the assignment of any Customer Purchase Agreement or Purchase Order for Equipment to [Plaintiff.]" Defendant's Statement of Additional Material Facts in Support of Resistance to Motion for Summary Judgment ("Def. Statement of Additional Facts") (docket no. 28-2) at 2. The Private Vendor Label Agreements provided that, in any transaction documents between Seamless and a customer, Seamless would be named as the sole owner of the transaction, even though the transaction was to be immediately assigned to Plaintiff. Def. App'x at 2, ¶ 11. The Private Label Vendor Agreements also provided that a customer would not receive notice of the assignment unless the customer defaulted. *Id.* To this end, Seamless appointed Plaintiff as its attorney-in-fact and gave Plaintiff the authority to act in Seamless's name in maintaining any transaction assigned to it.

Subsequently, Plaintiff and Seamless executed an "Amendment to Private Label Program Agreement" and an "Agreement and Blanket Assignment of Lease." Def. App'x at 7-8. Under the terms of the Agreement and Blanket Assignment of Lease, Seamless agreed to "enter into Lease Agreements with various customers," and Plaintiff agreed to "provide the funding for the [e]quipment which [wa]s the subject of the Lease

---

[2] Defendant provided these agreements to the court; however, the court cannot read portions of the agreements due to the small font used and the poor quality of the copies.

Agreements." *Id.* at 8. Seamless then agreed to assign to Plaintiff "all of its rights, title and interest in the Transaction Documents, including the Lease Agreements and the rental payments, and the Equipment which [wa]s subject to the Lease Agreements." *Id.*

Between about 2006 and 2007, Defendant entered into approximately thirteen separate agreements with Seamless for copy machines. These transactions were characterized as "C/CAMP Customer/Client Asset Management Program" ("C/CAMP") agreements. Plaintiff's Statement of Undisputed Material Facts in Support of Plaintiff's Motion for Summary Judgment ("Pl. Statement of Facts") (docket no. 24-2) at ¶ 11. Defendant maintains that Nancy Moreno, the individual who signed the C/CAMP agreements on Defendant's behalf, engaged in fraud when entering into the agreements with Seamless.

Immediately after Defendant and Seamless entered into the C/CAMP agreements, Seamless assigned the C/CAMP agreements to Plaintiff pursuant to the Private Label Vendor Agreements. Defendant's Response to Plaintiff's Statement of Undisputed Material Facts in Support of Plaintiff's Motion for Summary Judgment ("Def. Response to Pl. Statement of Facts") (docket no. 28) at ¶ 13. Defendant was not told about the assignment. Instead, Defendant made regular monthly payments under the C/CAMP agreements and addressed each of the payments to Seamless. *Id.* at ¶ 14. Defendant did not know that it was actually sending the monthly payments to Plaintiff at one of Plaintiff's addresses.

On June 20, 2008, Defendant and Seamless amended and consolidated the thirteen separate agreements into two C/CAMP agreements ("C/CAMP Agreements"). Seamless then immediately assigned the C/CAMP Agreements to Plaintiff. Again, Plaintiff did not inform Defendant of the assignment. Instead, Plaintiff sent Defendant billing statements which stated that they were from Seamless. On August 27, 2009, after the instant lawsuit was filed, Defendant received notice of the assignment and learned that it had actually been

making payments to Plaintiff at one of Plaintiff's addresses.

### C.  Defendant's Alleged Default

From July 2008 until April 2009, Plaintiff billed Defendant in Seamless's name, and Defendant made regular monthly payments during that time.  Defendant alleges that it learned that Seamless and Nancy Moreno had engaged in fraudulent activity and, therefore, stopped making payments under the C/CAMP Agreements.  Defendant alleges that it "first became aware of Seamless and Nancy Moreno's fraudulent activity when it discovered that the amount it was paying under the terms of the C/CAMP [A]greements were many times over the market rate for that type of lease arrangement."  Def. Statement of Additional Facts at ¶ 17.  Defendant maintains that Seamless knowingly delivered one of the fifteen copy machines listed in the C/CAMP Agreements to a business owned by Moreno's son.

In the Motion, Plaintiff alleges that Defendant's failure to continue making payments under the C/CAMP Agreements constitutes a default.  As a result, Plaintiff asks the court to find that, as a matter of law, Defendant breached the agreements, and to order Defendant to pay the full amount owed under the C/CAMP Agreements.

### VI.  ANALYSIS[3]

Plaintiff argues that it is entitled to summary judgment because: (1) the C/CAMP Agreements contain "hell or high water" clauses; (2) the C/CAMP Agreements contain waiver of defense clauses; and (3) Plaintiff is a holder in due course.  Plaintiff's Brief in Support of Its Motion for Summary Judgment ("Pl. Br.") (docket no. 24-1) at 2.  The court will address each of these arguments, in turn.

### A.  Hell or High Water Clauses

---

[3] The court shall apply Iowa law in its analysis.  *See Hammonds v. Hartford Fire Ins. Co.*, 501 F.3d 991, 996 n.6 (8th Cir. 2007) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)) ("[A] district court sitting in diversity applies the substantive law of the state in which it is located.").  The parties apparently agree that Iowa law applies as both parties cite Iowa law in their briefs.

Under an agreement containing a hell or high water provision, once a lessee has formally accepted certain property, the lessee has an unconditional obligation to continue to make lease payments for that property under the terms of the agreement. *See, e.g., Hinkel Excavation & Constr., Inc. v. Constr. Equip. Int'l, LTD*, No. C00-4090, 2001 WL 34008497, at *5-6 (N.D. Iowa 2001); *Citicorp of N. Am., Inc. v. Lifestyle Comm. Corp.*, 836 F. Supp. 644, 655-56 (S.D. Iowa 1993); *GreatAmerica Leasing Corp. v. Star Photo Lab, Inc.*, 672 N.W.2d 502, 504 (Iowa 2003). The lessee's unconditional obligation is separate and apart from any contractual obligation of another party, and it is irrelevant whether the property is suitable for its intended purpose, is lost or is destroyed. *Citicorp*, 836 F. Supp. at 655-66. "In short, rent payments continue to come hell or high water, without any reduction or offset, even if the lessee is wrongfully dispossessed of the equipment by the lessor[.]" *Colorado Interstate Corp. v. CIT Group/Equip. Fin., Inc.*, 993 F.2d 743, 749 (10th Cir. 1993) (quoting 1 Bruce E. Fritch & A. Reisman, Equip. Leasing-Leveraged Leasing 152-53 (3d ed. 1988)). Hell or high water provisions are common in the commercial leasing industry, and they have been uniformly upheld by both state and federal courts, including the Iowa Supreme Court. *See Star Photo*, 672 N.W.2d at 504. As the court in *Hinkel Excavation* noted:

> "The essential practical consideration requiring liability as a matter of law in these situations is that [hell or high water] clauses are essential to the equipment leasing industry. To deny their effect as a matter of law would seriously chill business in this industry because it is by means of these clauses that a prospective financier-assignee of rental payments is guaranteed security for his outright loan to the lessor. Without giving full effect to such clauses, if the equipment were to malfunction, the only security for this assignee would be to repossess equipment with substantially diminished value."

*Hinkel Excavation & Constr.*, 2001 WL 34008497, at *7 (quoting *Colorado Interstate*, 993 F.2d at 748).

The C/CAMP Agreements each state, "THIS IS A NONCANCELABLE/IRREVOCABLE AGREEMENT, THIS AGREEMENT CANNOT BE CANCELLED OR TERMINATED."[4] Plaintiff's Appendix in Support of Motion for Summary Judgment ("Pl. App'x") (docket no. 24-3) at 21, 23. Although not mentioned by the parties, the C/CAMP Agreements also provide, under a section entitled "ACCEPTANCE OF DELIVERY," the following:

> You certify that all the equipment listed above has been furnished, that delivery and installation has been fully completed and satisfactory. Further, all conditions and terms of this Agreement have been reviewed and acknowledged. *Upon your signing below, your promises herein will be irrevocable and unconditional in all respects.*

*Id.* (emphasis added). Moreno signed each C/CAMP Agreement under this provision on Defendant's behalf.

Because the C/CAMP Agreements each contain a hell or high water provision, Plaintiff maintains that Defendant cannot escape its contractual obligations to make payments under the C/CAMP Agreements. Defendant does not argue that the C/CAMP Agreements do not include hell or high water provisions. Instead, Defendant argues that the hell or high water provisions are unenforceable because: (1) Defendant did not accept the copiers that are the subject of this litigation; and (2) Plaintiff is not a holder in due course.

### 1. *Acceptance*

"An acceptance occurs under the Uniform Commercial Code after the lessee has had a reasonable opportunity to inspect the goods and (a) signifies or acts in a way signifying

---

[4] Because both parties characterize this as a hell or high water provision, the court will proceed as if it is. *See C & J Vantage Leasing Co. v. Wolfe*, 778 N.W.2d 66, No. 08-1100, 2009 WL 4115950, at *2 (Iowa Ct. App. Nov. 25, 2009) (table op.) (proceeding as if contract provision constituted a hell or high water provision because both parties characterized it as such).

the goods are conforming, and (b) the lessee fails to make an effective rejection of the goods." *Star Photo*, 672 N.W.2d at 505 (citing Iowa Code § 554.13515); *see also* Iowa Code § 554.2606. Defendant maintains that, because Moreno was engaging in fraud, she could no longer accept the copiers as Defendant's agent. Defendant further argues that it did not accept the goods, but instead made an effective rejection of the goods as soon as it learned of the "Moreno-Seamless fraud." Defendant's Brief in Resistance to Motion for Summary Judgment ("Def. Br.") (docket no. 28-1) at 12-13. Finally, Defendant maintains that, even if it did accept the non-conforming delivery, it later revoked the acceptance upon discovery of the non-conformity.

Even if the court found that Moreno could not accept the copiers on behalf of Defendant, it is clear that Defendant did, in fact, accept the copiers. On June 30, 2008, Plaintiff contacted Defendant's office manager, Adrienne Redd, who confirmed to Plaintiff that Defendant received the equipment and it was "installed and working." Pl. App'x 25-26; Plaintiff's Reply in Support of Its Motion For Summary Judgment ("Reply Br.") (docket no. 34) at 7-8. Thus, Defendant accepted the equipment by virtue of the June 30, 2008 telephone conversation between Plaintiff's employee and Defendant's office manager, in which the office manager confirmed that the goods had been delivered and were acceptable. *See Star Photo*, 672 N.W.2d at 506 (reaching same conclusion).

Further, Defendant made payments under the C/CAMP Agreements from July 2008 until April 2009. Defendant's refusal to continue making payments after April 2009 does not constitute an effective rejection of goods under Iowa law. *See Campbell v. AG Finder Iowa Nebraska*, 683 N.W.2d 126, No. 03-0323, 2004 WL 893937, at *3 (Iowa Ct. App. Apr. 28, 2004) (table op.) (noting a rejection is ineffective unless made within a reasonable time); *Star Photo*, 672 N.W.2d at 506 (same).

Finally, the court rejects Defendant's position that it was entitled to revoke its acceptance when it learned that the goods delivered were non-conforming. To support its

position, Defendant relies on *Grace Label, Inc. v. Kliff*, 355 F. Supp. 2d 965, 975 (S.D. Iowa 2005), which states that a party may "revoke his acceptance only if it is shown that he accepted the [goods] without discovery of the [defect] because his acceptance 'was reasonably induced . . . by the difficulty of discovery[.]'" *Id.* (quoting Iowa Code § 554.2608(1)(b)). Defendant maintains that Seamless delivered only fourteen of the fifteen copy machines to Defendant, and that Seamless and Moreno did not want Defendant to discover the non-conforming nature of the delivery. Assuming, without deciding, that the goods were non-conforming, Defendant has not presented any evidence or argument that its acceptance of the non-conforming goods was induced by difficulty of discovery. "A buyer may not revoke acceptance based upon defects that are not known to the buyer at the time of acceptance because of the buyer's own failure to make a reasonable investigation which is readily available." 77A C.J.S. *Sales* § 357 (2010); *see also* 14 Richard A. Lord, *Williston on Contracts* § 40:27 (4th ed. 2010) ("As a general principle, a buyer who could have easily discovered the claimed defects in the goods prior to their acceptance, by a reasonable inspection, cannot thereafter revoke acceptance on the basis of those defects."). The court concludes that, upon a reasonable inspection of the goods, Defendant could have easily discovered that only fourteen of the fifteen copy machines were delivered to the proper location. As a result, Defendant may not revoke its acceptance of the non-conforming goods.

### 2.    *Holder in due course*

Defendant argues that "a hell or high water provision is enforceable only where an assignee qualifies for the protections afforded a holder in due course." Def. Br. at 14. Defendant then argues that Plaintiff does not qualify as a holder in due course because Plaintiff did not take the assignment in good faith and without notice of any claim or defense. However, Defendant has misinterpreted the law on this issue.

As Plaintiff explains in its Reply, Defendant has confused the hell or high water

provision, which is enforceable regardless of whether the assignee is a holder in due course, with the waiver of defense provision, which is enforceable only if the assignee qualifies as a holder in due course. *See Benedictine College, Inc. v. Century Office Prods., Inc.*, 853 F. Supp. 1315, 1324-25 (D. Kan. 1994) (rejecting "argument that the enforceability of a 'hell or high water' clause should depend upon the assignee's notice of any claim or defense"); *see also In re O.P.M. Leasing Servs., Inc.*, 21 B.R. 993, 1007-1008 (Bankr. S.D.N.Y. 1992) (concluding that when a lease contains a hell or high water provision, it is irrelevant "whether a bad faith assignment or an assignment on notice of default . . . took place"); *Wolfe*, 2009 WL 4115950, at *2 (noting that a waiver of defense requires an assignee to be a holder in due course, while a hell or high water clause does not).

To support its claim that a hell or high water provision is enforceable only if the assignee is a holder in due course, Defendant cites *Citicorp*, 836 F. Supp. at 657-58. Defendant argues that the United States District Court for the Southern District of Iowa, in deciding *Citicorp*, "refused to enforce the terms of the contract until after it had concluded that the assignee qualified as a holder in due course." Def. Br. at 14. However, the district court in *Citicorp* considered the assignee's status as a holder in due course during its analysis of an agreement's waiver of defense provision, not during its discussion of the enforceability of a hell or high water provision. *See Citicorp*, 836 F. Supp. at 655-58. Defendant does not cite any other law to support its position.

Under Iowa law, a hell or high water provision is enforceable regardless of whether an assignee qualifies as a holder in due course. *See, e.g.*, *Wolfe*, 2009 WL 4115950, at *2 n.5; *Star Photo*, 672 N.W.2d at 504; *see also Benedictine College*, 853 F. Supp. at 1324-25; *In re O.P.M. Leasing Servs.*, 21 B.R. at 1007-1008. As a result, when Defendant signed the C/CAMP Agreements containing hell or high water provisions, Defendant agreed that it had a duty to continue making lease payments, regardless of any

claim it may have against Seamless or a third party, such as an assignee. *See generally Hinkel Excavation*, 2001 WL 34008497, at * 7; *Star Photo*, 672 N.W.2d at 506. Upon acceptance of the copy machines, Defendant's sole remedy for Seamless's failure to deliver one of the fifteen copy machines to the proper location was to bring an action against Seamless, Plaintiff or Nancy Moreno, while continuing to make lease payments as required under the C/CAMP Agreements. *See Hinkel Excavation*, 2001 WL 34008497, at * 7; *Star Photo*, 672 N.W.2d at 506.

### 3.    *Defenses*

As Defendant recognizes in its Brief, the effect of a hell or high water clause is generally to make the assignee of a lease a "'quasi holder in due course,' having essentially the same rights and freedom from defenses that would be enjoyed by a holder in due course of a negotiable instrument." Richard A. Lord, Absolute Obligation to Pay After Accepting Goods; "Hell or High Water" Clause, 19 Williston on Contracts § 53:28 (4th ed. 2010). Thus, "[t]he assignee will take free of all defenses that the lessee may have against the lessor except so called 'real' defenses." *Id.*; *see also Colorado Interstate*, 993 F.2d at 749 ("Where sophisticated parties enter into an agreement setting forth their rights and obligations, the terms of the agreement should control unless the agreement would otherwise be void under state law."). Iowa courts have held that "[d]efenses to contract formation may be raised despite an enforceable hell or high water clause." *Frontier Leasing Corp. v. Krueger*, No. 09-1843, 2010 WL 3894308, at *5-6 (Iowa Ct. App. Oct. 6, 2010) (table op.); *see also C & J Vantage Leasing Co. v. Outlook Golf Club, LLC*, 784 N.W.2d 753, 758 (Iowa 2010).

In the present case, Defendant argues that it "has provided sufficient evidence to create a question of fact regarding fraud in the factum during the formation of the C/CAMP Agreements." Def. Br. at 16. A contract induced by fraud in the factum is void. *See, e.g., Langley v. Fed. Deposit Ins. Corp.*, 484 U.S. 86, 93-94 (1987).

Therefore, fraud in the factum is a defense against a contract which includes a hell or high water provision. *See Frontier Leasing*, 2010 WL 3894308, at \*5-6; *see also Outlook Golf Club*, 784 N.W.2d at 758. Fraud in the factum is "fraud that induced the obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn of its character or its essential terms." Iowa Code § 554.3305. The official comments to Iowa Code section 554.3305 describe fraud in the factum, also referred to as "real" or "essential" fraud, as follows:

> The common illustration of [fraud in the factum] is that of the maker who is tricked into signing a note in the belief that it is merely a receipt or some other document. The theory of the defense is that the signature on the instrument is ineffective because the signer did not intend to sign such an instrument at all. Under this provision the defense extends to an instrument signed with knowledge that it is a negotiable instrument, but without knowledge of its essential terms. The test of the defense is that of excusable ignorance of the contents of the writing signed. The party must not only have been in ignorance, but must also have had no reasonable opportunity to obtain knowledge.

Iowa Code § 554.3305 cmt. 1.

Defendant maintains "that the C/CAMP Agreements were a direct consequence of Nancy Moreno's fraudulent actions." Def. Br. at 9. Defendant's only allegation of fraud is that Moreno directed Seamless to deliver one of the copy machines to a business owned by her son. Although Defendant implies that Seamless was involved in the alleged fraud, there is no evidence in the record that Seamless knew at the time the C/CAMP Agreements were signed, or even upon delivery and acceptance, that Moreno directed Seamless to deliver one of the copy machines to an improper location. Additionally, there is no evidence in the record that Plaintiff knew, at the time it took assignment of the C/CAMP Agreements, that Seamless delivered one of the copy machines to an improper location.

Because there is no evidence that Seamless disguised from Defendant the nature and

terms of the C/CAMP Agreements, Defendant argues that "Moreno was acting fraudulently and for her own benefit when she signed the C/CAMP Agreements" on Defendant's behalf. Def. Br. at 10. As a result, Defendant maintains that Moreno's knowledge of the terms of the C/CAMP Agreements cannot be imputed to Defendant. To support this assertion, Defendant cites only to the Restatement (Third) of Agency § 5.04 (2006) ("Restatement"), which states:

> For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is not imputed to the principal if the agent acts adversely to the principal in a transaction or matter, intending to act solely for the agent's own purposes or those of another person. Nevertheless, notice is imputed
>
> > (a) when necessary to protect the rights of a third party who dealt with the principal in good faith; or
> >
> > (b) when the principal has ratified or knowingly retained a benefit from the agent's action.
>
> A third party who deals with a principal through an agent, knowing or having reason to know that the agent acts adversely to the principal, does not deal in good faith for this purpose.

The court concludes that this defense to the hell or high water provisions must fail. First, Defendant has presented no argument to explain how Moreno acted adversely to Defendant *in the transactions*. As discussed above, the C/CAMP Agreements at issue here simply amended and consolidated thirteen other agreements which were formed between Defendant and Seamless between 2006 and 2007. There is no evidence that Moreno was acting adversely to Defendant at the time Moreno signed the two C/CAMP Agreements that consolidated the thirteen previous agreements. Defendant points to no provision in the C/CAMP Agreements that is adverse to Defendant. The C/CAMP Agreements both include the following provision:

> LOCATION OF EQUIPMENT: You will keep and use the
> equipment only at your address shown above and you agree
> not to move it unless we agree to it.

Pl. App'x at 22, 24. The only address on each C/CAMP Agreement is Defendant's address. Thus, there is no evidence in the record to support the assertion that Moreno was acting adversely to Defendant at the time she signed the C/CAMP Agreements on Defendant's behalf. The fact that Moreno later ordered Seamless to deliver one of the copiers to an improper location does not render the C/CAMP Agreements void. Even if a reasonable fact finder could infer that Moreno was acting adversely to Defendant at the time the C/CAMP Agreements were formed, the undisputed facts clearly demonstrate that Moreno did not intend to act solely for her own purposes because she directed Seamless to deliver fourteen of the fifteen copiers to Defendant's address.

Second, even if the court found that Moreno acted adversely to Defendant in the transactions and intended to act solely for her own purposes, the Restatement provides that notice is imputed to the principal when necessary to protect the rights of a third party who dealt with the principal in good faith. There is no evidence on this record to support an argument that Seamless acted in bad faith when it entered into the C/CAMP Agreements with Defendant. Likewise, there is no evidence that Plaintiff acted in bad faith when it took assignment of the C/CAMP Agreements. As a result, Moreno's knowledge of the elements of the C/CAMP Agreements must be imputed to Defendant in order to protect the rights of third parties.

Finally, even if the court could infer that Moreno acted adversely to Defendant for her own purposes, and that Seamless did not act in good faith, the undisputed evidence demonstrates that Moreno's supervisor and Defendant's office manager, Adrienne Redd, accepted the copy machines and served as Defendant's primary contact with Seamless. Despite Redd's knowledge of the transactions, Redd continued to deal with Seamless on Defendant's behalf, and Defendant continued to use the copy machines Seamless provided

to Defendant under the C/CAMP Agreements.  Thus, Redd later ratified the agreements and Defendant benefitted from the use of the copy machines.

Defendant cites no law for its position that it can void the C/CAMP Agreements which contain hell or high water provisions because the agent who signed the agreements on Defendant's behalf misappropriated one of the items in one of the agreements.  The C/CAMP Agreements at issue do not involve fraud in the factum, and the court must reject Defendant's defense against the enforceability of the hell or high water clauses in the C/CAMP Agreements.  Because the court concludes that the hell or high water provisions are enforceable, Defendant was obligated to continue paying rent under the agreements, come hell or high water.  Defendant concedes that it stopped making payments under the terms of the C/CAMP Agreements.  As a result, Plaintiff is entitled to summary judgment for Defendant's breach of the C/CAMP Agreements.

### B.  Waiver of Defense Clauses

Plaintiff's second stated ground for summary judgment is based upon the waiver of defense clause contained in each of the C/CAMP Agreements.  Each of the C/CAMP Agreements state:

> ASSIGNMENT:  YOU HAVE NO RIGHT TO SELL, TRANSFER, ASSIGN OR SUBLEASE THE EQUIPMENT OR THIS AGREEMENT.  We may sell, assign, or transfer this Agreement without notice.  You agree that if we sell, assign, or transfer this Agreement, the new Owner will have the same rights and benefits that we have now and will not have to perform any of our obligations.  You agree that the rights of the new Owner will not be subject to any claims, defenses, or set offs that you may have against us.

Pl. App'x at 22, 24.  Plaintiff contends that it is entitled to summary judgment because, under the terms of the C/CAMP Agreements, Defendant may not subject Plaintiff to any of the claims, defenses or set-offs that it has against Seamless.  Therefore, Plaintiff maintains that Defendant's conflict with Seamless did not entitle Defendant to stop making

payments to Plaintiff. Defendant counters by arguing that Plaintiff may not enforce the waiver of defense provision because Plaintiff is not a holder in due course, and even if it is, the C/CAMP Agreements were the result of fraud in the factum. The court will now consider whether, as an alternative ground for summary judgment, Plaintiff is entitled to enforce the waiver of defense clauses in the C/CAMP Agreements.

Waiver of defense clauses are only enforceable by an assignee if the assignee took the assignment for value, in good faith and without notice of any claim or defense. *See Citicorp*, 836 F. Supp. at 657-58. Such an assignee is entitled to the same status as a holder in due course. *Id.* Plaintiff took assignment of the C/CAMP Agreements for value, and there is no evidence that Plaintiff had any knowledge of a claim or defense at the time it took the assignment. Instead, Defendant alleges that Plaintiff is so closely connected with Seamless that "there is an open question of fact as to whether [Plaintiff] took the assignment in 'good faith.'" Def. Br. at 7. Although Defendant has not produced any evidence to support its position that Seamless engaged in fraud in the execution of the C/CAMP Agreements, Defendant generally alleges that Seamless was involved in fraud with Moreno when the C/CAMP Agreements were formed. Even if the court assumes that Seamless did act in bad faith when the C/CAMP Agreements were made, the close connection doctrine would not apply to impute Seamless's bad faith to Plaintiff.

Under the close connection doctrine, "'[a] transferee does not take an instrument in good faith when the transferee is so closely connected with the transfer that the transferee may be charged with knowledge of an infirmity in the underlying transaction.'" *Citicorp*, 836 F. Supp. at 658 (quoting *Bankers Trust Co. v. Crawford*, 781 F.2d 39 (3d Cir. 1986)). The close connection doctrine has not been uniformly adopted by courts, and the Iowa Supreme Court has not yet decided whether to adopt the doctrine. *See, e.g.*, *Outlook Golf Club*, 784 N.W.2d at 761 (declining to decide whether to adopt the close connection doctrine because the issue was not sufficiently preserved on appeal). In this

case, Defendant has not demonstrated that the Iowa Supreme Court would, if given the opportunity, adopt the close connection doctrine. In fact, Defendant has not cited a single case to support such a premise.

Assuming, without deciding, that Iowa courts would adopt the close connection doctrine, the court concludes that Defendant has failed to show that Plaintiff and Seamless were so closely connected in the execution of the C/CAMP Agreements that Seamless's purported bad faith should be imputed to Plaintiff. In *Citicorp*, 836 F. Supp. at 659, the United States District Court for the Southern District of Iowa discussed the test used by the New Jersey Supreme Court in *Unico v. Owen*, 232 A.2d 405 (N.J. 1967), when it considered whether there was a sufficiently close connection to impute a seller's bad faith to the financier. The *Unico* court stated:

> [W]hen it appears from the totality of the arrangements between dealer and financier that the financier has had a substantial voice in setting standards for the underlying transaction, or has approved the standards established by the dealer, and has agreed to take all or a predetermined or substantial quantity of the negotiable paper which is backed by such standards, the financier should be considered a participant in the original transaction and therefore not entitled to holder in due course status.

*Unico*, 232 A.2d at 417.

The court in *Citicorp* considered the *Unico* factors and it determined that the defendant had failed to establish a sufficiently close relationship between the financier and the seller to warrant application of the close connection doctrine. *Citicorp*, 836 F. Supp. at 659. Specifically, the court in *Citicorp* found a close connection was not established because: (1) the financier and the seller were "completely separate entities which share[d] no common officers or directors"; (2) the financier and the seller "engaged in an arms length transaction with respect to the assignment of the lease"; (3) the seller was under no obligation to offer the financier the lease assignment; (4) the financier was under no

obligation to accept the lease assignment; (5) the seller was not under any obligation to submit a certain percentage of its leases to the financier; and (6) the financier was not under any obligation to take a predetermined or substantial quantity of the leasing transactions generated by the seller. *Citicorp*, 836 F. Supp. at 659. The court also found that the facts that the financier's name appeared on some of the forms, the financier may have furnished some of the forms to the seller and the financier was aware of the seller's limited financial resources, were insufficient to warrant application of the close connection doctrine. *Citicorp*, 836 F. Supp. at 659-60.

In the present case, Defendant has not presented any evidence that Plaintiff had a substantial voice in setting standards for the provisions in the C/CAMP Agreements. Although Plaintiff did conduct a credit check and approve financing for Defendant, such fact does not amount to Plaintiff setting the standards or approving the standards established by Seamless. Further, it is clear that Plaintiff and Seamless were completely separate entities which shared no common officers or directors, and Plaintiff and Seamless engaged in an arms length transaction when Plaintiff took assignment of the C/CAMP Agreements. Additionally, Defendant has not presented any evidence that Seamless was obligated to offer Plaintiff the assignments; that Plaintiff was required to take the assignments; that Seamless was required to submit a certain quantity of its leases to Plaintiff; or that Plaintiff was required to take all or a predetermined or substantial quantity of the leases.

Having applied the factors set forth in *Unico* and discussed in *Citicorp*, the court concludes that Defendant failed to demonstrate that the close connection doctrine is applicable here. As a result, the waiver of defense clauses in the C/CAMP Agreements are enforceable unless Defendant successfully raises a valid defense against a holder in due course. The only such defense Defendant raises is that the C/CAMP Agreements were the result of fraud in the factum. The court has already determined, as a matter of law, that

the C/CAMP Agreements did not result from fraud in the factum. Thus, the court concludes that the waiver of defense clauses in the C/CAMP Agreements are enforceable. As a consequence, even if Defendant has a claim against Seamless, Defendant was not entitled to stop making payments to Plaintiff under the terms of the C/CAMP Agreements. Because Defendant stopped making payments, Defendant breached the C/CAMP Agreements, and Plaintiff is entitled to summary judgment.

### C. Holder in Due Course

Plaintiff also maintains that it is a holder in due course and is entitled to summary judgment because Defendant has not asserted any defenses that would defeat Plaintiff's right to enforce the C/CAMP Agreements. Defendant argues that Plaintiff is not a holder in due course because Plaintiff has a close connection with Seamless and because there are fact questions regarding whether Plaintiff took assignment of the C/CAMP Agreements in good faith. For the reasons stated above, the court rejects Defendant's argument that Plaintiff is not a holder in due course because of a close connection between Plaintiff and Seamless. Thus, Plaintiff is entitled to all of the protections of a holder in due course.

Defendant argues that, even if Plaintiff is a holder in due course, Plaintiff is not entitled to summary judgment because the C/CAMP Agreements "were a consequence of fraud in the factum." Def. Br. at 9. For the reasons stated above, the court also rejects Defendant's argument that the C/CAMP Agreements were the consequence of fraud in the factum. Defendant has raised no other defense that can be brought successfully against a holder in due course. *See generally* Iowa Code § 554.3305(1)(a). Thus, Plaintiff is entitled to enforce the C/CAMP Agreements as a holder in due course and Plaintiff is entitled to summary judgment due to Defendant's failure to make the required payments under the agreements.

### D. Damages

Under the terms of the C/CAMP Agreements, upon Defendant's default, Plaintiff is entitled to require Defendant to pay the entire balance of the agreements, discounted to present value at a rate of 6%. Pl. App'x at 22, 24. Plaintiff has elected to take this course of action. In the Motion, Plaintiff maintains that the total amount due and owing on C/CAMP Agreement No. 459715 is $109,040.07, and the total amount due and owing on C/CAMP Agreement No. 474412 is $105,041.31. These figures include: (1) the total amount of past due payments; (2) the amount of future payments discounted to present value; (3) taxes; (4) late charges; (5) an asset recovery fee; and (6) a reduction for the proceeds from the sale of the equipment. All of these charges and reductions are permitted under the terms of the C/CAMP Agreements. Defendant does not address the issue of damages in its Resistance. Having reviewed the record, the court shall grant the Plaintiff's request for damages in the amount of $214,081.38, with interest at the rate of 8% per annum.

### VII. CONCLUSION

For the foregoing reasons, the Motion (docket no. 24) is **GRANTED**. The Clerk of Court is **DIRECTED** to enter judgment in Plaintiff's favor in the amount of $214,081.38, with interest at the rate of 8% per annum.

**IT IS SO ORDERED.**

**DATED** this 19th day of January, 2011.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA